

Tuesday, February 12, 2019

## Consumer Warning: Copyright Trolling by Higbee and Associates

Over the past few years, the law firm Higbee and Associates (based in Los Angeles, although it pretentiously labels itself a "National Law Firm") has become identified with a pattern of making aggressive and, in many cases, unsupportable demands for the payment of significant sums of money by individuals and nonprofits whose web sites feature copyrighted graphics, and especially photographs, that they saw online but have never tried to license. The firm's principal, Mathew Higbee, revels in his reputation for aggressive enforcement. (The interview linked above, for example, is featured on his own firm's web site.)

Either in concert with a specialized search firm or using his own firm's software, this firm patrols the Internet looking for graphics (especially photographs) that have been copied improperly from online sources. The firm then sends a demand letter bearing Higbee's signature, threatening to seek up to $150,000 in statutory damages as well as attorney fees unless the target of the letter promptly agrees to pay a specified amount. Deploying a tactic that is all too familiar from the depredations of Evan Stone and Prenda Law, the specified amount is low enough – usually in the low four figures, but I have seen high three figures as well —that it is not likely to be cost-effective for the target to hire a knowledgeable copyright lawyer to litigate an infringement lawsuit, even if the claim is bunk or, at least, if there is good reason to believe that the claim can easily be defended. The letter encloses a document identifying the allegedly infringing use as well as the online location where the work was found; another document that purports to authorize the firm to represent the copyright holder in seeking damages in connection with the work; a proposed "settlement agreement"; and a credit card payment form. If the target of the letter does not respond, or responds without agreeing to pay, then the Higbee firm increases the pressure: a non-lawyer who calls herself a "claim resolution specialist" sends an email warning that the claim is going to be "escalated to the attorneys," at which point "[t]claim gets more stressful and expensive," and an assurance that "my goal is to not let that happen to you."

The documents linked above all relate to a single Higbee demand to a single target, but I have seen a number of other demand letters and ensuing emails from this firm, and spoken to several other copyright lawyers who have helped clients respond to Higbee's blustering and threats, and it appears to me that these are pretty standard exemplars. Indeed, when I was reaching out to some other copyright lawyers to try to get their sense of some of the documents I was reviewing, a number of them guessed that it was Higbee based only on what I said I wanted to ask about, based on work they had done for their clients trying to address his threats against them. Plainly, this is a copyright troll with an outsized reputation.

**The Demand to Homeless United for Friendship and Freedom ("HUFF")**
As it happens, I had heard recently from colleagues in the copyright law community about threats that Higbee was making to nonprofits when I was contacted by Thomas Leavitt, a former client in a free speech case, about a Higbee demand to Homeless United for Friendship and Freedom ("HUFF"). HUFF is a loose-knit activist group in Santa Cruz, California, that addresses issues of poverty, with specific reference to homelessness. It maintains a blog which, among other things, shows media coverage related to homelessness. On August 6, 2012, the blog reposted an article from the New York Times about a mass detention of migrants in Greece. That article featured a photograph showing an immigrant in the hands of the Greek police. The photograph could be seen in the HUFF blog post, along with the photo credit "Angelos Tzortzinis/Agence France-Presse — Getty Images." but although the text of the Times article was placed directly on the blog, the photograph appeared only by virtue of deep-linking to the graphic as it appeared on the Times' own web site, at this address.

More than six years later, on January 2, 2019, Mathew Higbee sent HUFF his demand letter, accompanied by the other documents described above. Several things jumped out at me. First, instead of reciting that the copyright in the photograph had been registered, and either attaching the registration or at least citing the registration number, the letter recited the photo's "PicRights Claim Number" – a matter of utterly no consequence for the recipient of the demand. The registration number, by contrast, is far more significant in this context, because, for most copyrighted works (the exception is discussed below), a copyright holder cannot bring suit for infringement until the copyright has been registered, and regardless of the exception, a copyright holder cannot seek statutory damages or attorney

fees for infringements that take place before registration, or even for infringements that continue after registration unless the copyright was registered promptly after the work was first published. Because this photograph appeared in the New York Times within a day after the photo was taken, and more than six years before the demand letter was sent, a failure to register would have meant that the letter's warning about statutory damages and attorney fees was an empty bluff meant to intimidate.

Second, the letter was plainly a boilerplate form, containing somewhat stilted language that was poorly adapted to the specifics of HUFF's claimed infringement. For example, the letter varies back and forth between referring to the recipient in the second and third person singular, suggests that HUFF might have its wages garnished, warns of action against "the business owner," and refers to "the attached exhibits" even though only one exhibit was attached. Indeed, the "representation agreement" that was provided along with the demand letter, purporting to show that Agence France-Presse, PicRights and a European version of PicRights had authorized Higbee to pursue claims on its behalf about HUFF's alleged infringement with respect to this specific photograph, did not identify the photograph but simply indicated that Higbee was handling "a copyright infringement matter."

Third, the exhibit revealed Higbee's recognition that the "infringing location" for the copyrighted work was not HUFF's own web site but rather the web site of the New York Times which, presumably had licensed the photograph (I was able to confirm that assumption by contacting the Times' legal department). And the Court of Appeals for the Ninth Circuit has decided, in *Perfect 10 v. Amazon*, that Google does not infringe a photographer's copyright by including images in its search results, because American copyright law does not prevent the "framing" of deep-linked images that actually sit on the server of a party that is entitled to display the photograph and serve copies of the image to visiting viewers; it is only displaying and distributing from the defendant's own server that violates the copyright laws (the "server test").

**Higbee Retreats Rapidly When Challenged by a Lawyer**

Consequently, I wrote back to Higbee, asking directly whether the copyright in the image had been registered, and pointing out some of the legal flaws in his demand letter as well as the bullying email that had been sent as a followup by his "claims resolution specialist," Rebecca Alvarado. I told him that he needed to issue a prompt retraction of the demand, else we would be seeking a declaratory judgment of non-infringement. At the same time, to eliminate any risk that we might be suing a copyright holder that had never actually authorized the making of threats in its name, I reached out to Agence France-Presse's lawyers in France, and was able to obtain their verification that they had, indeed, authorized Higbee's threatening communications.  Consequently, I reached out to identify California counsel so that we could file suit promptly if that were needed.

What followed was a rapid retreat by Higbee, accompanied by some truculence while, at the same time, he signaled his recognition both that he had no basis for seeking any monetary relief for his client, and that I knew that he hadn't a leg to stand on. First, he sent me an email on February 1, dropping PicRights as a client, insisting that he had a viable basis for suing on the image (while implicitly admitting that his client had not registered the copyright), and implicitly dropping as well the demand for $1775; instead, he asked me to make "some reasonable offer" comparable to the cost of filing a federal court complaint ($400) as well as service costs (which would have been free under the waiver of service procedure"). The redacted email address on the cc line was my client's email, violating his ethical obligations given that the client was represented by counsel. (In a separate email chain, Higbee tried to excuse this violation by claiming that he had no idea I was a lawyer, but I found that statement less than credible, particularly considering that I know of at least one other situation in which his firm made contact with a party after an attorney contacted the Higbee firm on the party's behalf in in response to the demand. Higbee also asked me how a lawyer not belonging to the California Bar could help a California client in a copyright matter. The mere fact that he thought he had to make this point told me how desperate he was getting to avoid the merits).

I responded to his February 1 email with this letter, which explained why the arguments he had put forward in his email could not save his claims. His next responses (shown in this exchange)  made clear that he knew he was on the ropes – first he said that a "semi-reasonable offer" would be enough, and then he asked plaintively that at least our client might remove its deep link to the photograph – when I declined he told me that the refusal was "absurd." In the meantime, I learned about some astonishing developments regarding a demand letter that Higbee had made to a community college professor named Claudia Eckelmann relating to the inclusion of a cartoon in the online syllabus that she had provided for her students' edification. She responded to Higbee's demand letter and subsequent bullying emails by filing a complaint against Higbee's firm in state small claims court (not against the copyright-owning client), seeking a declaration that she did not owe anything. Eckelmann told me that she had immediately taken down the syllabus when the Higbee's client first contacted her; but apparently that did not appease Higbee's relentless appetite to squeeze money out of potential targets. Higbee responded by removing the state-court proceeding to federal court, asserting both that the court had subject-matter jurisdiction because the dispute was really about copyright infringement (Higbee seems to have ignored the rule that, for a removal to be proper, federal jurisdiction has to be shown on the face of the state-court complaint, and the state complaint does not make clear whether Eckelmann seeks a declaration of non-infringement or a judgment under state unfair business practices law).  Indeed, his notice implicitly suggests, at the same time, that there was no case or controversy because, given Eckelmann's recalcitrance, his firm had

decided to "close" the case. Of course, if there was no case or controversy there would be no Article III jurisdiction to hear the removed case.

I suggested to Higbee that he might extricate Agence France-Presse from the possibility of having to defend against a declaratory judgment action in which it could not possibly recover any significant monetary relief without retracting the demand and thus admitting that it was wrongful, by simply doing the same as what he had done with Eckelmann, declaring the case closed. And that is what he did.

## Lessons for dealing with copyright demands from Higbee

Steve Vondran has posted some broad suggestions about how to consider and address copyright demands from Higbee; my ambition here is somewhat narrower. Considering the recent spate of demands from the Higbee firm seeking to enforce non-registered copyrights, the first thing a recipient should do is look to see whether Higbee has claimed that the copyright has already been registered and provided the registration number. If the copyright has not been registered, he cannot bring suit on an alleged infringement unless the work is not a "United States work" – as discussed in my second letter to Higbee, that term refers to any work that was first published in the United States, or first published simultaneously in the United States and abroad (at least, most countries); "simultaneously" is defined by the Berne Convention as meaning within thirty days of each other.  To be sure, a copyright owner can register at any time and then sue, but as explained in my first letter to Higbee, such a plaintiff cannot obtain statutory damages and attorney fees for infringements that occurred only before registration, and cannot obtain that relief if registration is effected more than three months after the first publication. That limitation applies even if the photograph was not a United States work.  That, to me, is the real explanation for Higbee's retreat (and his retreat in other cases of which I am aware)- – it costs money to register, and he and his clients cannot make money on the cases if he cannot win statutory damages and attorney fees. So in addition to questions of fair use, the issue of registration is the first matter a recipient of his letters should explore. It is the key to the situation. For Higbee, who repeatedly asked me what he should do better, this is my public response: either stop trying to enforce unregistered copyrights, or at least be honest in your demand letters about the fact that you have no claim for statutory damages and attorney fees, and take those cases on an hourly basis without making deceptive threats to seek statutory damages and fees.

## Is Higbee deliberately misleading his targets?

The HUFF matter would have ended with Higbee's statement to me that he had "closed" the case, as he claimed to have done with respect to Eckelmann, except that, a couple of days later, I received this remarkable email from one of Higbee's "claims resolution specialisists," Rebecca Alvarado.  Here she was, AFTER her boss had "closed the case," responding to my initial email to Higbee on behalf of HUFF, and warning that, despite my points, the "fact is there is a copyright claim on the table" and that she was "willing to work with me to see that the claim is resolved." She gave me her direct line, so I called her to find out just what resolution she had in mind, as well as what she might tell me about the nature of the firm's practice.

The call was enlightening. Unlike Higbee, who never directly responded to my question about whether the copyright was registered, and claimed to have some basis for arguing that statutory damages could be sought even despite his client's apparent failure to register the copyright in timely fashion, Alvarado made no bones about the facts that the copyright was unregistered and that statutory damages were hence not available; instead, she told me, defensively, that the demand letter did not say that statutory damages would be sought, but only that these might be "possible" in some circumstances. She told me that her client was only seeking actual damages, in terms of the lost licensing fee — but she could not tell me what that licensing fee was (so, how could she "resolve" the copyright claim?). And she admitted that her firm's business model involves paying its clients a fractional share of the moneys that they wring out of their victims. She told me that she did not know what the fraction was, but Higbee told Fast Company that clients who came to him through a no-longer-existing service called "Copypants" received 50% of the financial gain. Moreover, he boasted as well that some 75% to 80% of the targets who receive his demand letters pay him without having to be taken to court. With numbers like that, it is no wonder that an otherwise reputable copyright holder like Agence France-Presse is apparently willing to give him free rein to represent that he is proceeding on its behalf. Considering his abuses, however, this company ought to be ashamed of using an enforcement representative like Higbee.

It is hard not to have concerns about his apparent overreaching. When he sends demand letters with respect to non-registered copyrights, he has no business referring to the possibility of an award of $150,000 in statutory damages as well as attorney fees, which are legally precluded. In the course of preparing this article, I spoke to a number of legitimate copyright lawyers who told me that, when they send demand letters claiming infringement on behalf of their clients, they would never refer to statutory damages in a demand letter if registration has not been effected in a timely fashion. The use of the word "possible" is not likely to save the firm from the conclusion that their demand letters deliberately convey a misleading impression. This problem is exacerbated by what appears to be the standard followup email from paralegals such as Alvarado who tell victims that the dispute is about to become "more stressful and expensive" if the matter is "escalated to the attorneys," while portraying themselves as the good cops who can save the victims from the bad cops.

As I see it, Higbee is skating at the ethical edge here. If he does this on a regular basis, as it appears he does, he may will be leaving

himself vulnerable to a class action claim from victims to his bullying who have paid him based on such misleading representations.

When Higbee and I had a telephone conversation about his "closing" the case against HUFF, he made the remarkable statement, plainly intended to portray himself as a good guy about whom I was getting the wrong impression, that the reasons why he was closing the case against HUFF, and why he had closed the case against Eckelmann even though she had defied his firm without the aid of counsel (and against another of my clients), was that the firm undertakes careful screening when a situation is moved to "the litigation track." It was that screening, he said, that revealed that HUFF's and Eckelmann's uses were entirely non-commercial.

The plain implication from this statement was that no such screening had taken place before the demand letters went out. When I told him I saw this implication, he was quick to deny it, saying that his firm also screens cases before demand letters are issued. However, he could not explain what the nature of the pre-demand-letter screening had been in any of these cases, or how he had missed what should have been obvious on the face of each situation. The "claim number" on his demand to HUFF was 518891; I had seen a demand letter he sent less than four months earlier bearing claim number 514822; with the volume of demand letters that this implies, how careful could the pre-demand screening be?  And besides, if three-quarters to four-fifths of all recipients of his demand letters pay up without contesting potential liability, how much comfort can we draw from the claim that there is more careful screening at a later stage?

In addition, I have been in touch with Agence France-Presse's counsel in Europe about their enforcement strategies. Their explanations relate entirely to a desire to present large businesses from using their content without paying license fees. But it appears that Higbee is using their imprimatur to do much more than go after businesses, and that Agence France-Presse is profiting from unjustified demands made to targets well beyond the big businesses they claim to be targeting. This company should, as I see it, be held to account in the court of public opinion if not in other courts for its complicity in Higbee's enforcement schemes.

**Not All of Higbee's Claims to Enforce Copyright Are Equally Sleazy**

Despite what I have discussed above, there is a core of legitimacy to some aspects of Higbee's practice. There are too many Internet users who assume that the mere fact that an image is sitting in an open location online is a sufficient reason to copy that image and paste it onto their own web sites. That assumption is simply not correct.  Indeed, photographers earn a living by taking photos, developing them in an attractive and compelling manner, and selling copies, or the right to make copies, or allowing others to disseminate or display their work. Creators of content deserve to be paid.

One of Higbee' longstanding clients, for example, is a photographer named Alexander Wild who specializes in photographs of insects; a number of Higbee's cases are brought against pest-control companies who use Wild's images without a license. These companies deserve what happens to them when they get sued, and the copyright eco-system is well-served by the existence of the Higbee's practice, which stands as a warning that copying that cannot be defended as fair use can be costly.

But the fact that some of his work is entirely legitimate does not excuse the sleazy part of his practice. For this, he deserves public obloquy, and clients such as Agence France-Presse that take advantage of Higbee's services to make illegitimate profits from victims who are too unsophisticated about the law to understand how they are being taken deserve to be shamed along with him.

**Acknowledgments**

In closing, I want to express gratitude to several copyright scholars and copyright lawyers who were willing to talk to me about Higbee and to help me think through the copyright law issues.   Heidi Tandy was willing to be named; others who prefer to remain anonymous to protect their clients.  I am especially grateful to Joseph Gratz, who, in addition to discussing the issues with me, signed on as co-counsel when it looked as if HUFF was going to have to file suit for a declaratory judgment of non-infringement.

**UPDATE:**

Mathew Higbee has posted a long comment that you can see below.  It is hard to take anything he says seriously considering that he lies so boldly and so readily.  Perhaps I will dissect his comments in a future post; for now, I invite readers to compare his assertions to the discussion in the blog post and the linked documents that show what he really does.

Posted by Paul Levy on Tuesday, February 12, 2019 at 05:26 PM | Permalink

**Comments**



Hi Paul. Thank you for inviting me to comment on your article. There are more inaccuracies and mischaracterizations than I care to address. However, I

will quickly point out a few.

My client's decision to no longer pursue the claim had absolutely nothing to do with the fact that your client decided to retain counsel, but simply the discovery that your client was a non-government entity (NGO), which, along with other economic related factors, put it outside of my client's enforcement parameters. The inference that we do not like working with attorneys is not true. While we are happy to work with unrepresented parties, our preference is to deal with attorneys who understand the nature of the claims. A majority of the claims we resolve involve represented parties.

Our clients choose which cases we pursue. Generally, our clients choose to have us only pursue unauthorized use of their work by persons or entities that provide or promote goods or services for a fee, generate ad revenue, or solicit contributions. We never intentionally pursue private non-commercial infringements. That being said, often times it is difficult to accurately assess an infringer based on the limited information available, especially when the natural tendency of most websites is to make the entity look bigger and more successful than it is. Whenever we discover a case is outside our firm's or our client's enforcement parameters, we close it (even if offers to settle have been received) and take any necessary steps to prevent similar errors in the future.

Anyone who believes that the existence of a screening stage prior to the litigation stage is proof that no screening is done at the pre-litigation stage needs to gain more insight on how law firms and businesses that depend on efficiency operate. Every law firm will take what they learned during the pre-litigation stage and evaluate it before making a recommendation about litigation to their client. The cases we litigate or that we refer to other law firms to litigate are all screened multiple times prior to pre-litigation and litigation efforts.

We never pursue a claim that we do not believe has merit. We also never state that a claim will definitely involve statutory damages, but instead, we caution people as to what may be possible. The initial letter is sent at a time when we know very few facts about the extent of the infringement or how many other images may have been infringed. It is not uncommon for us to find additional infringements even after we begin litigation that may give rise to statutory damages. Also, during the pre-litigation stage, we often do not know the viability or availability of additional claims that could give rise to statutory damages and attorneys fees, for instance, violations of 17 U.S.C. 1202, which involves alteration or removal of copyright management information, and does not require registration for an award of statutory damages. Some of our clients have thousands of registered images that they have not yet matched to their image library. So, Ms. Alvarado's statement about the image not being registered was accurate for purposes of our reaching a settlement, as we would negotiate a resolution as if the image was not registered; however, there is a chance that we would later need to revise our position on whether or not the image was registered. Our goal is not to be heavy-handed, but rather to convey the seriousness of the matter and caution the business about the potential risks. We also suggest they consider consulting an attorney.

Copyright infringement is a big problem that threatens the livelihood of talented artists and the viability of important publishers of news and commentary. Unlike other areas of property theft or trespass, which are primarily policed by government entities, the protection of intellectual property falls almost exclusively on the copyright holder. Policing anything is difficult. Policing large scale infringement is beyond difficult. However, our tremendous success rate in and out of court is a testament to our ability to do things right. That being said, I know we are not perfect and there is always room for improvement.

So, let me conclude by saying the following: my law firm has been blessed with the opportunity to represent incredible artists and professionals from all over the world, not to mention two of the world's three largest news agencies. We are proud to represent them and to help them solve a very challenging and serious problem. I welcome any criticism as an opportunity to find ways to improve our ability to better achieve our goal of protecting our client's work with the integrity and professionalism they expect. To the extent that your article provides an opportunity to do that, I thank you. I wish you the best of luck in the future.

Posted by: M. Higbee | Thursday, February 14, 2019 at 05:30 PM



Paul:

Thank you for this article. It explains my experience to a "T." Received a Higbee demand letter related to an article I received from a friend who does a news podcast. The article gave a run down of that particular night's show with some brief commentary. I reposted the article. Unbeknownst to me, the article contained a picture that Higbee says infringed upon their client Agence France-Presse. I removed the picture but Higbee's clerks are still emailing me wanting payment. Now I understand why.

Thank you!

Mike

Posted by: Mike Spaulding | Wednesday, February 13, 2019 at 11:30 AM



This recent expose about Higbee & Associates and their demand letter scheme written and researched by Mr. Levy was an unexpected surprise. It is an amazing piece of work filled with analysis, research, cross-references, links to letters/emails, and so much more. The time, effort, and work Mr. Levy put into this project are substantial. I have no other word to describe this expose except that it's "packed".

I have followed the Higbee Demand Letter Scheme for years through the hosting of a dedicated Higbee Associates Letter & Lawsuits forum on the ExtortionLetterInfo website. I have seen no singular article that has as much analysis packed into this article as this one. Nothing else written thus far comes close to touching Mr. Levy's work. I say this being very familiar with the Higbee operation and their demand letter scheme. Nevertheless, I still

Case: 1:19-cv-01814-DAP Doc #: 1-2 Filed: 08/09/19 6 of 6. PageID #: 20

need more time to go through every link Mr. Levy provided and put it all into context in my mind.

Unless Mr. Levy decides to do a follow-up, his article will be the definitive "go to" article for anyone receiving a Higbee Demand Letter. It is a MUST READ! Through Mr. Levy's and Public Citizen's ongoing advocacy for consumers, Mr. Levy has called out the Higbee operation in a very big, unique, and public way.

Posted by: Matthew Chan | Wednesday, February 13, 2019 at 10:25 AM

The comments to this entry are closed.